**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Greentree Hospitality Group Incorporated, | No. CV-22-00088-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| Patrick Mullinix, | |
| Defendant. | |

Before the Court is a Motion for Entry of Default Judgment filed by Plaintiff Greentree Hospitality Group Incorporated ("Plaintiff") (Doc. 11). Defendant Patrick Mullinix ("Defendant") was served with the Complaint, Summons, and this Motion; however, he has not answered or otherwise appeared in this action and did not respond to Plaintiff's Motion. For the following reasons, the Court sets an evidentiary hearing to determine Plaintiff's damages.

**I.    BACKGROUND**

    **A.    Plaintiff's Allegations**

This matter concerns Plaintiff's breach of contract claim against Defendant. Plaintiff is a Delaware corporation with its headquarters and principal place of business in Scottsdale, Arizona. (Doc. 1 at ¶ 2). Defendant is a resident of Texas and the Principal of non-party Advantage Hotels, Inc. ("Advantage").[1] (*Id.* at ¶¶ 3–4). Defendant, either

---

[1] Advantage Hotels, Inc., is a Texas corporation. (Doc. 11 at 2). Defendant has signed contracts on behalf of Advantage as its "President" and "CEO." (Docs. 11-1 at 5; 11-2 at 4).

through his capacity as an individual or through Advantage, entered into four written agreements with Plaintiff: (1) a "Franchise Development Agreement" ("Franchise Agreement") (Doc. 11-1); (2) a Promissory Note ("Note") (Doc. 11-2); (3) a Guaranty of Payment ("Guaranty") (Doc. 11-3); and (4) a "Share Pledge Agreement" (Doc. 11-4). The Guaranty and Share Pledge Agreement were executed concurrently with the Note.

First, Defendant—through his capacity as President and Chief Executive Officer ("CEO") of Advantage—entered into a Franchise Agreement with Plaintiff on October 23, 2020. (Doc. 11-1 at 5). Therein, Advantage agreed to solicit and attempt to procure additional franchisees for Plaintiff. (Doc. 11 at 3–4). The initial term of the Franchise Agreement was for one year, eligible for renewal thereafter provided Advantage met the goal of attaining eight franchisees during the first year. (Doc. 11-1 at 3).

Second, Defendant—through his capacity as President and CEO of Advantage—entered into a Note with Plaintiff on December 31, 2020, after receiving a $150,000.00 loan (the "Loan") from Plaintiff. (Doc. 1 at ¶ 12). The Note contractually obligated Advantage to repay the Loan, with interest, by December 28, 2021. (Doc. 11-2 at 2).

Third, Defendant—through his capacity as an individual—entered into a Guaranty with Plaintiff on December 31, 2020. (Doc. 11-3 at 2). Therein, Defendant assumed "Guaranteed Obligations," which is defined as:

> (i)  the due and punctual payment in full (not merely the collectability) of all amounts owing by [Advantage] to [Plaintiff], including, without limitation, the principal, interest, and premium, if any, on and under the Note and of the indebtedness evidenced thereby, all according to the terms of the . . . Note; and
>
> (ii) the due and punctual payment in full (not merely the collectability) of all other sums and charges which may at any tine be due and payable under and in accordance with the Note.

(*Id.*) Defendant guaranteed Plaintiff "the full, prompt, and complete payment when due under the Guaranteed Obligations." (*Id.* at 3). The Guaranty further provided that "[a]ll sums payable to [Plaintiff] . . . shall be payable on demand and without reduction for any

offset, claim, counterclaim, or defense[.]" (*Id.*)

Fourth, Defendant—through his capacities as an individual and as President and CEO of Advantage—entered into a Share Pledge Agreement with Plaintiff on December 31, 2020. (Doc. 11-4 at 2). Therein, Defendant pledged all of his shares in Advantage as security for the Note. (Doc. 11 at 3).

As to the Note, Advantage allegedly failed to make any payments on the principle of the Loan. (Doc. 1 at ¶ 16). Defendant, on behalf of Advantage, allegedly made ten interest-only payments of $1,250.00 to Plaintiff between February 1, 2021, and November 3, 2021. (*Id.* at ¶¶ 13–14).

### B.     Procedural History

On January 18, 2022, Plaintiff filed a Complaint against Defendant for breach of contract, alleging Defendant failed to make payments as required under the Guaranty. (Docs. 1 at ¶¶ 22–23; 11 at 6). On January 29, 2022, Plaintiff's counsel, via a Texas process server, personally served the Complaint and Summons on Defendant at 22 Champion Lane, Austin, Texas 78734. (Doc. 7). This is the address the Defendant listed in the Guaranty as the address where all relevant notices, demands, requests, consents, approvals, or other communications should be sent. (Doc. 11-3 at 7). Defendant did not file an answer or otherwise appear in this action. Therefore, on February 23, 2022, Plaintiff filed a Request for Clerk's Entry of Default (Doc. 9). The Clerk of Court entered Default on February 24, 2022, pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. (Doc. 10). Plaintiff then filed the pending Motion for Entry of Default Judgment (Doc. 11).  Plaintiff mailed Defendant a copy of this Motion (*Id.* at 8); however, Defendant did not file a response.

## II.    LEGAL STANDARD

Once a party's default has been entered, the district court has discretion to grant default judgment against that party.  *See* Fed. R. Civ. P. 55(b)(2); *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).  "When entry of judgment is sought against a party who has failed to plead or otherwise defend, a district court has an affirmative duty to look into its jurisdiction over both the subject matter and the parties." *In re Tuli*, 172 F.3d 707, 712

(9th Cir. 1999).

Once a court finds jurisdiction, it must consider: "(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." *Eitel*, 782 F.2d at 1471–72. In applying these *Eitel* factors, "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977).

## III.     DISCUSSION

The Court will first confirm that it has subject matter jurisdiction over the case and personal jurisdiction over Defendant. The Court will then assess the merits of Plaintiffs' Motion for Default Judgment under the *Eitel* factors. Last, the Court will examine the amount of damages sought by the Plaintiff.

### A.     Subject Matter Jurisdiction

First, Plaintiff has established this Court has jurisdiction over this action pursuant to diversity jurisdiction. Federal courts have jurisdiction under 28 U.S.C. § 1332 when: (1) there is a complete diversity of citizenship among the parties, *i.e.*, no plaintiff is a citizen of the same state as any defendant; and (2) the amount in controversy exceeds $75,000.00. Plaintiff is a Delaware corporation with its principal place of business in Scottsdale, Arizona, while Defendant is a resident of Lakeway, Texas. (Doc. 1 at ¶¶ 2–3). Additionally, the amount in controversy is for a loan exceeding $75,000.00. (Doc. 1 at ¶¶ 12 – 19).

Therefore, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

### B.     Personal Jurisdiction

Second, although this Court does not have general jurisdiction over Defendant, Plaintiff has established this Court has specific personal jurisdiction over him. "It is the plaintiff's burden to establish the court's personal jurisdiction over a defendant." *Donell v.*

*Keppers*, 835 F. Supp. 2d 871, 876 (S.D. Cal. 2011) (default-judgment case) (quoting *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001)). "For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). A federal court sitting in diversity borrows the long-arm jurisdictional statute of the forum state. *See, e.g.*, *Lake v. Lake*, 817 F.2d 1416, 1420 (9th Cir. 1987). Here, pursuant to Section 8 of the Guaranty at issue, the Guaranty is governed by California law. (Doc. 11-2 at 6). Like Arizona, California's long-arm statute authorizes the exercise of personal jurisdiction on any basis that is consistent with the state or federal constitution. Cal. Civ. Proc. Code § 410.10 (West). The personal-jurisdiction analysis thus collapses into a single inquiry under federal due process. *See, e.g.*, *Lake*, 817 F.2d at 1420.

Plaintiff asserts this Court has both general and specific jurisdiction over the nonresident Defendant. *See Cybersell v. Cybersell*, 130 F.3d 414, 416 (9th Cir. 1997) ("A court may assert either specific or general jurisdiction over a defendant."). General jurisdiction exists when the defendant has "continuous and systematic" contacts with the forum state, whereas specific jurisdiction exists when the controversy arises from or is related to the defendant's specific contact with the forum state. *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 (1984). The "mere fact that [a defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." *Walden v. Fiore*, 571 U.S. 277, 291.

1. **General Jurisdiction**

Plaintiff argues this Court has general jurisdiction over Defendant "due to his continuous and systematic contacts with the state of Arizona." (Doc. 11 at 2). For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). Plaintiff alleges Defendant is a resident of Lakeway, Texas. (Doc. 1 at ¶ 3). Therefore, the

Court finds that it does not have general jurisdiction over Defendant because Plaintiff has not set forth any factual allegations that Arizona is Defendant's domicile.

### 2. Specific Jurisdiction

Plaintiff alternatively argues this Court has specific jurisdiction over Defendant because of his contacts with Arizona. To determine whether specific personal jurisdiction has been established, courts in the Ninth Circuit apply a three-prong "minimum contacts" test:

> (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1142 (9th Cir. 2017). A plaintiff must satisfy the first two prongs to establish personal jurisdiction. *Id.* "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Burger King*, 471 U.S. at 476–78. If one of the first two prongs is not met, the inquiry ends there and the Court does not have personal jurisdiction over the defendant. *Id.*

### a. Prong one: Purposeful Availment

To determine the first prong of the minimum contacts test, the Ninth Circuit has established separate inquiries depending on whether the nature of the claims at issue arise from a contract or alleged tortious conduct. *See Morrill*, 873 F.3d at 1142. ("We generally apply the purposeful availment test when the underlying claims arise from a contract, and the purposeful direction test when they arise from alleged tortious conduct."). Plaintiff's Complaint alleges a breach of contract claim against Defendant for his failure to make

payments as required under the Guaranty. Thus, the court will apply the "purposeful availment" inquiry to determine whether the first prong of the minimum contacts test is met. *Id.* The United States Supreme Court has defined purposeful availment as:

> where the defendant deliberately has engaged in significant activities within a State, or has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Id*. at 1149 (quoting *Burger King Corp.*, 471 U.S. at 475–76).

The purposeful availment analysis in breach of contract cases requires a "qualitative evaluation of the defendant's contact with the forum state." *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1130 (9th Cir. 2003). "As the Supreme Court has expressly cautioned, a contract alone does not automatically establish minimum contacts in the plaintiff's home forum." *Boschetto v. Hansing*, 539 F.3d 1011, 1017 (9th Cir. 2008). Rather, there must be "actions by the defendant himself that create a 'substantial connection' with the forum State." *Picot v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015) (quoting *Burger King*, 471 U.S. at 475). In determining whether such contacts exist, courts are to consider "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Burger King*, 471 U.S. at 479. "Merely random, fortuitous, or attenuated contacts are not sufficient." *Id.* (internal quotation marks omitted). Moreover, a choice-of-law provision, on its own, is "insufficient to confer jurisdiction." *Id.* at 482.

Defendant's execution of four interrelated contracts with Plaintiff constitutes sufficient minimum contacts with Arizona for specific personal jurisdiction purposes. First, the terms of the contracts sufficiently show Defendant maintains a substantial connection with Arizona. For example, the Franchise Agreement created an ongoing franchise development relationship between Plaintiff and Defendant that involved Defendant's continuous collaboration with Plaintiff and utilization of Plaintiff's resources located in

Arizona. (Doc. 11-1 at 2). It also provided the prospect for renewal. Therefore, "the franchise agreement [is] not an isolated or fleeting business contact. Instead, it [is] a contract that contemplated a long-term relationship between the parties." *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020) (discussing *Burger King*, 471 U.S. at 480). Moreover, the Guaranty and Share Pledge Agreement were executed pursuant to the Note, and the Note directly references Franchise Agreement. These facts support a finding that Defendant's contacts with Arizona are not "[m]erely random, fortuitous, or attenuated." *Burger King*, 471 U.S. at 479.

Second, the parties' actual course of dealing in carrying out the four written agreements show Defendant created continuing obligations with foreseeable consequences in Arizona. Plaintiff argues Defendant was "in near-daily contact with [Plaintiff's] executive team in Scottsdale regarding his performance under the Franchise Development Agreement" for more than a year. (Doc. 11 at 5). Defendant also mailed or wired ten payments Plaintiff's headquarters in Scottsdale pursuant to the Note throughout 2021. (Doc. 1 at ¶¶ 13–14). Last, the Guaranty signed by Defendant "may provide an independent basis for personal jurisdiction" over him. *Glob. Commodities Trading Grp.*, 972 F.3d at 1110 (explaining that "a corporate officer who personally guarantees a corporation's obligation 'interjects himself into the transaction,' subjecting the officer to personal jurisdiction on like terms as the corporation").

Thus, Plaintiff has met its burden under prong one of the minimum contacts test.

### b.     Prong two: Relatedness

Prong two of the minimum contacts test looks to the plaintiff's claim against the defendant and requires it "must be one which arises out of or relates to the defendant's forum-related activities. Here, Plaintiff's breach of contract claim arises out of the Note and Guaranty that form the basis for Defendant's minimum contacts with Arizona. *See supra* Section III.B(2)(a). Thus, Plaintiff has met its burden under prong two.

In sum, the Defendant has sufficient minimum contacts with Arizona and the Court

has personal specific jurisdiction over the Defendant.

### C. *Eitel* Analysis

Having found subject matter jurisdiction and personal jurisdiction over Defendant, the Court will proceed with the *Eitel* factors to assess the merits of Plaintiffs' Motion for Default Judgment.

#### 1. Possibility of Prejudice to Plaintiff

Defendant has not responded or otherwise appeared in this action and, without an entry of default judgment, Plaintiff's damages would remain unrelieved. Therefore, this factor favors default judgment.

#### 2. Merits of Plaintiff's Claim and Sufficiency of Complaint

"Under an *Eitel* analysis, the merits of plaintiff's substantive claims and the sufficiency of the complaint are often analyzed together." *Dr. JKL Ltd. v. HPC IT Educ. Ctr.*, 749 F. Supp. 2d 1038, 1048 (N.D. Cal. 2010). The second and third *Eitel* factors favor a default judgment where the complaint sufficiently states a claim for relief upon which the plaintiff may recover. *See Danning v. Lavine*, 572 F.2d 1386, 1388–89 (9th Cir. 1978)); *Pepsico, Inc.*, 238 F. Supp. 2d at 1175. "Upon entry of default, the facts alleged to establish liability are binding upon the defaulting party." *Danning*, 572 F.2d at 1388. "However, it follows from this that facts which are not established by the pleadings of the prevailing party, or claims which are not well-pleaded, are not binding and cannot support the judgment." *Id*.

The elements for a breach of contract claim in California are "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *D'Arrigo Bros. of California v. United Farmworkers of Am.*, 169 Cal. Rptr. 3d 171, 178–179 (Cal. Ct. App. 2014) (quoting *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011)). The Court finds that the Complaint sufficiently alleged each of these elements. (Doc. 1 at ¶¶ 7, 13, 21–23, 24); *see also Geddes*, 559 F.2d at 560 ("[T]he factual allegations of the complaint . . . will be taken as true."). Thus, the second and third *Eitel* factors also weigh in favor of granting the

Motion.

### 3. Sum of Money at Stake

Regarding the fourth factor, the Court considers the amount of money at stake in relation to the seriousness of a defendant's conduct. *See Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1176 (C.D. Cal. 2002). "If the sum of money at stake is completely disproportionate or inappropriate, default judgment is disfavored." *Gemmel v. Systemhouse, Inc.*, 2008 WL 65604, at *4 (D. Ariz. Jan. 3, 2008). Plaintiff seeks to enforce the Guaranty to recover the $150,000.00 Loan it issued to Defendant, plus interest. (Doc. 1 at ¶ 1). Plaintiff also seeks attorneys' fees . (Doc. at 7–8). The Court finds this amount is proportionate to the Defendant's conduct, which constitutes failing to repay Plaintiff for the Loan it issued, plus interest, under the Note. This factor favors entering default judgment.

### 4. Potential Disputes of Material Fact

The time has passed for Defendant to dispute the Complaint's allegations. At this stage, the allegations are taken as true. *See Geddes*, 559 F.2d at 560. Therefore, the possibility of dispute is low. This fifth *Eitel* factor favors entering default judgment.

### 5. Excusable Neglect

Defendant was served with the Complaint, Summons, and this Motion to Defendant at the address he listed in the Guaranty. (Docs. 7; 11 at 8; 11-3 at 7). This is the same address he listed in the Franchise Agreement, Note, and Share Pledge Agreement (Docs. 11-1 at 3; 11-2 at 4; 11-4 at 5). There is no indication that Defendant's failure to defend this action is due to excusable neglect. Therefore, the sixth factor favors entering default judgment.

### 6. Policy Favoring Decisions on the Merits

The Court is unable to reach the merits of this case because Defendant has failed to plead or otherwise defend this action. Therefore, this final factor weighs against granting default judgment.

Overall, the Court finds the *Eitel* factors support an entry of default judgment

against Defendant.

### D.     Damages Analysis

Having found that entry of default judgment is proper, the Court must determine what damages Plaintiff is entitled to. In contrast to the other allegations in a complaint, allegations pertaining to damages are not automatically taken as true. *TeleVideo Sys., Inc.*, 826 F.2d at 917–18.  "The plaintiff is required to provide evidence of its damages, and the damages sought must not be different in kind or amount from those set forth in the complaint." *Amini Innovation Corp. v. KTY Int'l Mktg.*, 768 F. Supp. 2d 1049, 1054 (C.D. Cal. 2011); Fed. R. Civ. P. 54(c). This is so a defendant may know from the complaint what the potential award may be, and the defendant may then decide whether a response is worthwhile. *See e.g.*, *Silge v. Merz*, 510 F.3d 157, 160 (2d Cir. 2007) (limiting damages in a default judgment award to what is "specified in the [complaint's] 'demand for judgment'. . . ensures that a defendant who is considering default can look at the damages clause, satisfy himself that he is willing to suffer judgment in that amount, and then default without the need to hire a lawyer").

Plaintiff seeks to recover damages due to Defendant's breach of the Guaranty "including the $150,000.00 (plus interest) owed[.]" (Doc. 1 at ¶¶ 1, 22–24). These damages are presumably comprised of Defendant's (1) unpaid principal of the Loan; (2)  unpaid interest-only payments; and (3) interest accrued on the Loan. "The Court may enter a default judgment without a damages hearing when . . . 'the amount claimed is a liquidated sum or capable of mathematical calculation.'" *Capitol Specialty Ins. Corp. v. Chaldean LLC*, 2022 U.S. Dist. LEXIS 132713, at *12 (D. Ariz. July 25, 2022) (quoting *HTS, Inc. v. Boley*, 954 F. Supp. 2d 927, 947 (D. Ariz. 2013)); *Davis v. Fendler*, 650 F.2d 1154, 1161 (9th Cir. 1981).

The first and second measures of damages are definite sums that can be calculated from the provisions of the Guaranty and Note. The Note contractually obligated Advantage to pay Plaintiff $150,000.00 in principal plus $15,000.00 in interest-only payments[2] by

---

[2] The Note states "interest only monthly payments of $1,250.00 shall be due and payable on the first day of each month during the term of this Note." (Doc. 11-2 at 2). Since the

- 11 -

December 28, 2021. (Docs. 1 at ¶ 1; Doc. 11-2 at 2). This totals to $165,000.00. According to the Plaintiff's Complaint, Advantage has only made ten interest-only payments of $1,250.00 to date, amounting to $12,500.00. (Doc. 1 at ¶ 13). Plaintiff represents Defendant was contractually obligated to pay $151,250.00 on December 28, 2021. (Doc. 11 at 7). But based on Plaintiff's alleged facts, it appears this calculation is incorrect: $165,000.00 minus the $12,500.00 paid by Advantage equates to $152,500.00, not $151,500.00. Thus, it is presently unclear to the Court how Plaintiff calculated the $151,500.00 it says it is owed pursuant to the Guaranty.

However, the third measure of damages cannot be certainly calculated because there are two separate interest accrued formulas set forth in the Note. For example, Plaintiff seeks to invoke the interest accrued formula under Sections 5 (Doc. 11 at 7), which states:

> If any installment of principal and/or interest is not paid within five (5) days of the date such installment becomes due and payable, [Advantage] promises to pay [Greentree] a late charge of six percent (6%) of such overdue installment for the purpose of defraying the expense incident to handling such delinquent payment. . . . Upon the occurrence of an "Event of Default" (as defined in Paragraph 6 []), principal and accrued, unpaid interest due under this Note, at [Greentree's] option, thereafter bear interest at the rate hereinabove provided plus three percent (3%) until such default shall be cured in full.

(Doc. 11-2 at 3). Plaintiff interprets this language to "provide that if Advantage defaults on the payment of any principal or interest then the unpaid amount shall bear interest at nine percent (9%) per annum." (Doc. 11 at 7). But the Court is not sure this 9% interest rate is to accrue per annum since Section 5 does not mention make any explicit mention of a "per annum" rate. (Doc. 11-2 at 3). Moreover, the first page of the Note sets forth a second interest accrued formula: [Advantage] hereby promises to pay [Plaintiff] . . . the principal sum of [$150,000.00] . . . together with interest on the unpaid principal balance at a rate (based on a 360-day year, actual days per annum elapsed) of ten percent (10%)[.]" (Doc.

term of the Note spans twelve months from December 31, 2020 through December 29, 2021, Defendant was required to pay a total in $15,000 in interest. ($1,250.00 X 12 = $15,000).

*Id.* at 2). Therefore, the Court cannot calculate Plaintiff's total alleged damages with certainty, and a damages hearing is necessary. *Cf. Capitol Specialty Ins. Corp.*, 2022 U.S. Dist. LEXIS 132713, at *12.

### E. Costs and Attorney's Fees

Last, Plaintiff seeks an award of costs in the amount of $567.00 and attorney fees in the amount of $6,248.00. (Doc. 11 at 8). Because the Court has yet to hold the evidentiary hearing to resolve the issue of damages, the Court will defer on these findings if and when a judgment of default is entered in Plaintiff's favor.

### IV. CONCLUSION

In sum, the Court finds subject matter jurisdiction over the present action, personal jurisdiction over Defendant, and that the *Eitel* factors support an entry of default judgment against Defendant. The Court will set a damages hearing to confirm how Plaintiff's damages should be calculated. Specifically, the Court will ask Plaintiff to clarify the following issues: (1) whether Advantage owes Plaintiff $151,250.00 or $152,500.00 in unpaid principal and unpaid interest-only payments as of December 28, 2021; (2) which interest formula in the Note should be used to calculate Defendant's interest accrued on the Loan; and (3) the amount of Defendant's interest accrued on the Loan.

Accordingly,

**IT IS HEREBY ORDERED** that a Hearing on damages under Fed. R. Civ. P. 55(b)(2)(B) is scheduled for **January 23, 2023 at 2:00 p.m.** in Courtroom 605 of the Sandra Day O'Connor United States Courthouse at 401 W. Washington Street in Phoenix, Arizona 85003. All parties may participate and are permitted to appear by videoconference. Instructions for how to attend via videoconference will issue by separate email.

**IT IS FURTHER ORDERED** that Plaintiff shall file a notice within 14 days of the date of this Order advising the Court whether it intends to prove its damages by live witnesses and/or affidavits. If live witnesses are to appear, Plaintiff must include in its notice how many of each types of testimony it anticipates and the name of each witness. Plaintiff must also provide the Court with a list of all exhibits to be offered at the hearing

in its notice. All original exhibits must be marked and delivered to the Courtroom Deputy by **noon** the day prior to the hearing. Finally, with its brief, Plaintiff must file and email to chambers a proposed form of judgment, which includes the exact amount of damages Plaintiff is seeking under each theory of damages. Any damages not included in the proposed judgment will be deemed to be waived.

Dated this 21st day of December, 2022.

Honorable Diane J. Humetewa
United States District Judge